2012 ND 178

Richard J. NICHOLS as Trustee of the Richard Nichols Mineral Trust Agreement dated May 28, 2009; Robby J. Nichols and Jacalyn Nichols; Kim Vachal as Trustee of the Ron and Sue Nichols Family Mineral Trust; JD Nichols LLLP; Randal B. and Bonnie L. Nichols Family LLP, Plaintiffs and Appellees,

v.

James M. GOUGHNOUR, individually and as Personal Representative of the Estate of Eunice Goughnour; LaDonna Edwards; Margo Wenzel and James Wenzel; Penny Edwards; Judy Nichols; Susan Trana; Mark Nichols; Serena Nichols; Darron Nichols; Earl R. Hauge and Ann M. Hauge; Rita Wagner, Wallace J. Wagner, Rudolph M. Maurer and Karlyn J. Maurer, as Trustees of the Rudolph M. and Karlyn J. Maurer Family Mineral Trust; Kathleen Yoder; Dale Wagner; Melissa Frederick; Nels Family, LLC; Robert Nichols; Robert E. Lincoln; Mary L. Lincoln; William F. Lincoln; Carol Nichols; Valera Marie Hayes; Alan Roger Sinclair; Elizabeth McDonald, aka Beth McDonald; Forrest John Spicher, aka Jon Spicher; Kelly Fulton; Kathryn Poskevich; Joan Hosler; Michael Miller; Barbara Linden; Bert Hague; Mike Nichols; Donnelle E. Nichols; Darrell Nichols; and all persons unknown, claiming any estate in or lien or encumbrance upon the property described in the Complaint, Defendants and Appellants.

No. 20110336.

Supreme Court of North Dakota.

Aug. 30, 2012.

Rehearing Denied Sept. 25, 2012.

Andrew T. Forward (argued) and Richard P. Olson (appeared), Minot, N.D., for plaintiffs and appellees.

Bruce A. Selinger, Dickinson, N.D., for defendants and appellants.

SANDSTROM, Justice.

[¶ 1] The successors to the interests of eight siblings of John Q. Nichols ("Goughnour defendants") appeal from a summary judgment in a quiet title action by the successors to the interests of John Q. Nichols ("Nichols plaintiffs") to determine ownership of 1/2 of the mineral interests in a parcel of land in Mountrail County. The Goughnour defendants claim they collectively own 1/4 of the mineral interests in the land and the Nichols plaintiffs own 1/4 of the mineral interests. The district court decided the Goughnour defendants collectively own 1/9 of the mineral interests in the land and the Nichols plaintiffs own 7/18 of the mineral interests. We affirm.

I

[¶ 2] The parties are descendants of John C. and Margaret Nichols. In 1950, John C. Nichols owned all the surface interest and 1/2 of the mineral interests in 640 acres of land in Mountrail County. After the deaths of John C. and Margaret Nichols, their nine children, Muriel Wakeman, Eunice Goughnour, Paul Nichols, Donald Nichols, John Q. Nichols, Rita Wagner, Robert Nichols, Genevieve Lincoln, and Clair Nichols, each owned an undivided 1/9 surface interest and an undivided 1/18 interest in the minerals. In documents dated in June 1955, eight of the siblings each executed separate "warranty deed[s]" that stated they did "grant, bargain, sell, and convey . . . all my undivided one-ninth interest in and to" the tract of land to John Q. Nichols. In each deed, the grantors "covenant[ed] . . . they are well seized in fee of land, real estate and premises aforesaid, and have good right to sell and convey the same in manner and form aforesaid" and agreed to "warrant and defend" John Q. Nichols from claims against the property. Each deed also said it:

hereby excepted from this grant and there is hereby reserved from this grant, to the grantors, 25% of all minerals, gas, oil and hydrocarbon compounds and 25% of all royalties on account thereof with the right to prospect, explore and drill for such gas, oil, and hydrocarbon compounds on and under the surface of said land.

According to attestations by notary publics, seven of the deeds were signed in June 1955, and one deed was signed in February 1956. All eight deeds were filed for record with the register of deeds for Mountrail County on March 2, 1956.

[¶ 3] On March 2, 1956, John Q. Nichols and his wife executed and recorded a quit claim deed conveying certain tracts of land to themselves, including the land involved in this action and excepting "three-fourths of all mineral interests in and under" that land.

[¶ 4] In March 1960, John Q. Nichols' wife wrote a letter to one of her husband's sisters, Rita Wagner, stating in part:

Some oil guys stopped here on Feb. 10th to lease 3 quarters on the old mans that's all they could take as they have to stay a mile from their last lease & that was Tom Saubers so they could only take the 3 So. ones. They offered $1.00 an acre straight through so everyone leased around here for that. They told us their lawyer looks into all titles of land their going to lease & 3/4 was in Jacks name & 1/4 in Bobs name. We were so surprised as we figured that guy in Kansas would get 1/2 & we'd get 1/4 & the heirs 1/4. He always got 1/2 before, but Jack motioned me not to say anything. He asked them how come it was just in Bobs name as it should be all of you, but they claim its that way on the title & they said they wouldn't lease it if they had to deal with 9 people so don't know what to do. He said they'd

lease it this way & Bob could split the 1/4 between you guys! They'd even figure out how much he should send each of you if Bob wanted them to. Don't know what happened when they called Bob but we haven't gotten any money yet so afraid it didn't go through. They gave us a draft for $360.00 with the option to pick it up in 30 days if anything was wrong. It had to go to Bismark [sic] etc. first.

It's been 40 days now & haven't heard a word so either Bob didn't lease or something else was wrong. If the 1/4 isn't leased we can't lease our share either. Surely could have used the money as it would pay the taxes at least. I don't think the rest of you would have to be afraid of getting beat out of your oil rights as in each of them things you all signed it stated right in there that you all retained your share of 1/4 of the oil rights. Don't know what to do as they said if times changed they wouldn't lease it because it wouldn't pay them to have to deal with 9 people.

Well maybe we won't have to worry as we haven't heard anything yet. Toms leased a couple of days before us & he hasn't gotten anything yet either so am still hoping. They told us at the bank it sometimes takes *60* days. Has Bob written anything about it to you? How his name is the only one down is beyond me. Either the oil guys lawyer fowled up or else Schulte did. I suppose we could go up & see for ourselves, but would like to wait till we see if this deal is going through or not.

Is awful funny about that Kansas guy too as went to the register of deeds & they said he had 1/2 the mineral rights & he always got 32 of the 64 dollars we had before. That was several years ago of course so I'm really puzzled.

[¶ 5] After John Q. Nichols died, a 1984 inventory and appraisement of his estate identified his mineral interests in the tract of land:

TOWNSHIP 154 NORTH, RANGE 89 WEST:

. . . .

| | | |
|---|---|---|
| Section 19: | SE1/4 | (40 acres) |
| Section 20: | SW1/4 | (40 acres) |
| | NW1/4 | (40 acres) |
| | SE1/4 | (40 acres) |

[¶ 6] In 2011, the Nichols plaintiffs, the successors to John Q. Nichols' interests in the land, brought this quiet title action against the Goughnour defendants, the successors to the interests of John Q. Nichols' eight siblings, to determine the parties' respective shares of the 1/2 mineral interests in the land. According to the Goughnour defendants, the eight deeds from the eight siblings to John Q. Nichols were part of a single transaction with a goal of splitting the family's 1/2 mineral interests so John Q. Nichols would own 1/4 of the minerals and the eight siblings would collectively own 1/4 of the minerals. The Goughnour defendants claimed the 1956 quitclaim deed from John Q. Nichols and his wife to themselves, the 1960 letter from John Q. Nichols' wife to Rita Wagner, and the 1984 inventory and appraisement of John Q. Nichols' estate showed the family's intent that John Q. Nichols would own 1/4 of the mineral interests and the eight siblings would collectively retain 1/4 of the mineral interests as part of a single transaction.

[¶ 7] The district court granted summary judgment for the Nichols plaintiffs, concluding they owned 7/18 of the mineral interests and the Goughnour defendants collectively owned 1/9 of the mineral interests. The court rejected the Goughnour defendants' argument that the eight warranty deeds were part of a single transaction, concluding the deeds were not from the same parties and were not dependent on each other. The court concluded each deed could stand on its own and could not

be united into one deed and interpreted as a single transaction. The court decided the separate deeds were unambiguous and each deed reserved 1/4 of the 1/18 mineral interest that each grantor owned. The court thus decided the Nichols plaintiffs owned 7/18 of the mineral interests and the Goughnour defendants collectively owned 1/9 of the mineral interests.

[¶ 8] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. The appeal is timely under N.D.R.App.P 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–27–01.

## II

[¶ 9] Summary judgment under N.D.R.Civ.P. 56(c) is a procedural device for the prompt and expeditious disposition of a lawsuit without a trial " 'if either litigant is entitled to judgment as a matter of law and if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving factual disputes will not alter the result.' " *Melchior v. Lystad*, 2010 ND 140, ¶ 7, 786 N.W.2d 8 (quoting *Langer v. Pender*, 2009 ND 51, ¶ 10, 764 N.W.2d 159). Whether a district court properly granted summary judgment " 'is a question of law that we review de novo on the record.' " *Melchior*, at ¶ 7 (quoting *Trinity Hosps. v. Mattson*, 2006 ND 231, ¶ 10, 723 N.W.2d 684).

## III

[¶ 10] The Goughnour defendants argue the district court erred in deciding the separate warranty deeds from John Q. Nichols' eight siblings to him were unambiguous. They argue the court erred in not considering the eight deeds as a single transaction and in ignoring compelling evidence to resolve the ambiguity created by the deeds. They argue the family intend-ed for the eight siblings to collectively retain a 1/4 interest in the minerals and for John Q. Nichols to get a 1/4 interest in the minerals. They claim they are entitled to a collective 1/4 interest in the minerals, and the court erred in "rationaliz[ing]" *Duhig v. Peavy–Moore Lumber Co., Inc.*, 135 Tex. 503, 144 S.W.2d 878 (1940), instead of applying *Gilbertson v. Charlson*, 301 N.W.2d 144 (N.D.1981).

[¶ 11] The Nichols plaintiffs respond the district court did not err in deciding the eight warranty deeds were unambiguous and in concluding extrinsic evidence about the parties' intent could not be considered. They argue the court correctly decided the eight deeds were not a single transaction, and they argue the court properly applied *Gilbertson* and decided the eight siblings' separate warranty deeds evidenced an intent for each of the eight siblings to retain 1/4 of the 1/18 mineral interest they individually owned in 1955.

[¶ 12] The primary purpose in construing a deed is to ascertain and effectuate the grantor's intent. *Mueller v. Stangeland*, 340 N.W.2d 450, 452 (N.D. 1983). "However, deeds that convey mineral interests are subject to general rules governing contract interpretation, and we construe contracts to give effect to the parties' mutual intentions." *Gawryluk v. Poynter*, 2002 ND 205, ¶ 8, 654 N.W.2d 400 (citations omitted). "When the language of a deed is plain and unambiguous and the parties' intentions can be ascertained from the writing alone, extrinsic evidence is inadmissible to alter, vary, explain, or change the deed." *Id.* at ¶ 9. "If a contract is ambiguous, extrinsic evidence may be considered to clarify the parties' intentions." *Id.* "A contract is ambiguous when rational arguments can be made for different interpretations." *Id.* "Whether a contract is ambiguous is a question of law for the court to decide." *Id.* "On appeal, we

independently review a contract to determine if it is ambiguous." *Id.*

[¶ 13] Instruments that have been executed at the same time, by the same parties, in the course of the same transaction, and concerning the same subject matter, may be read and construed together. *Trengen v. Mongeon,* 206 N.W.2d 284, 286 (N.D.1973). In *Trengen,* at 286, this Court said a warranty deed conveying 960 acres of land and a separate payment agreement reciting consideration for the 960 acres between the same parties must be construed together to ascertain the parties' intentions. Under N.D.C.C. § 9–07–07, "[s]everal contracts relating to the same matters between the same parties and made as parts of substantially one transaction are to be taken together." In *First Nat'l Bank v. Flath,* 10 N.D. 281, 287, 86 N.W. 867, 870 (1901), this Court interpreted that language and stated the requirement that several contracts are to be "taken together" does not mean they are to be joined into a single contract. This Court said that language means the contracts "are to be taken together" for the purpose of interpreting either the transaction to which they relate, or the several contracts themselves. *Id.* This Court explained the statute does not purport to destroy the separate identity of the several contracts and does not unite two or more contracts relating to a transaction into a single contract. *Id.*

[¶ 14] We agree with the district court that the eight separate warranty deeds are unambiguous and cannot be read together as part of a single contract or one transaction. Each of the warranty deeds is from a separate grantor and not from the same party. *See Trengen,* 206 N.W.2d at 286; *Flath,* 10 N.D. at 287, 86 N.W. at 870. Nothing on the face of each deed refers to the other deeds or indicates the deeds were dependant on each other or

united into one transaction. *See Flath,* 10 N.D. at 287, 86 N.W. at 870. We conclude each deed is clear and unambiguous, and extrinsic evidence therefore was not admissible to alter, vary, explain, or change the deed. The plain language of each deed conveyed the grantor's undivided 1/9 interest in the land and excepted and reserved a 1/4 interest in all minerals under the land. Each grantor owned only a 1/18 mineral interest in the land, and each deed resulted in an overconveyance of minerals from each of the eight siblings to John Q. Nichols. We reject the Goughnor defendants' claim that in this action to determine title to minerals, an overconveyance of minerals creates a latent ambiguity which permits the introduction of extrinsic evidence. *See Gawryluk,* 2002 ND 205, ¶ 11, 654 N.W.2d 400 (rejecting similar claim).

[¶ 15] In cases involving a grantor's overconveyance of minerals to a third-party grantee, this Court has applied the *Duhig* rule to construe the deed. *See Melchior,* 2010 ND 140, ¶ 8, 786 N.W.2d 8; *Gawryluk,* 2002 ND 205, ¶ 11, 654 N.W.2d 400; *Miller v. Kloeckner,* 1999 ND 190, ¶ 9, 600 N.W.2d 881; *Acoma Oil Corp. v. Wilson,* 471 N.W.2d 476, 478–82 (N.D.1991); *Mau v. Schwan,* 460 N.W.2d 131, 133–36 (N.D. 1990); *Sibert v. Kubas,* 357 N.W.2d 495, 496–98 (N.D.1984); *Kadrmas v. Sauvageau,* 188 N.W.2d 753, 756 (N.D.1971). Under *Duhig,* "where a grantor conveys land in such a manner as to include 100% of the minerals, and then reserves to himself 50% of the minerals, the reservation is not operative where the grantor owns only 50% of the minerals. The deed is construed as undertaking the transfer of 50% of the minerals to the grantee. Both this grant and the reservation cannot be given effect, so the grantor loses because the risk of title loss is on him." *Melchior,* at ¶ 8 (quoting *Miller,* at ¶ 9). In *Gawryluk,*

at ¶¶ 12–14, this Court exhaustively explained the history and rationale of the *Duhig* rule:

> In *Duhig,* 144 S.W.2d at 878–79, a third party owned an outstanding one-half mineral interest in certain land, and the grantor owned the surface and the remaining one-half mineral interest. The grantor conveyed the surface to the grantee by warranty deed but reserved one-half of all the minerals under the land. *Id.* The grantor and grantee both claimed the one-half mineral interest that was not owned by the third party. *Id.* at 879. The Texas Supreme Court concluded the grantee owned the surface and a one-half mineral interest, the third party owned the outstanding one-half mineral interest, and the grantor owned nothing. *Id.* at 880. In reaching that conclusion, the court employed a two-step analysis under principles of estoppel. *Id.* The court observed the grant clause gave the grantee all of the surface and a one-half mineral interest but the reservation clause reserved a one-half mineral interest in the grantor. *Id.* Because the grantor purported to retain a one-half mineral interest and the other one-half mineral interest was owned by a third party, the grantor breached the clause warranting title to a one-half mineral interest. *Id.* By analogy to the doctrine of estoppel by deed against assertion of an after-acquired title, the court held the grantor was estopped to assert the reservation of a one-half mineral interest. *Id.*

In 1 Williams & Meyers *Oil and Gas Law,* § 311, p. 580.39 (2001) the authors explain the *Duhig* rule:

> The *Duhig* rule says that where a grantor conveys land in such a manner as to include 100% of the minerals, and then reserves to himself 50% of the minerals, the reservation is not operative where the grantor owns

only 50% of the minerals. The deed is construed as undertaking the transfer of 50% of the minerals to the grantee. Both this grant and the reservation cannot be given effect, so the grantor loses because the risk of title loss is on him.

The effect of *Duhig* is that a grantor cannot grant and reserve the same mineral interest, and if a grantor does not own a large enough mineral interest to satisfy both the grant and the reservation, the grant must be satisfied first because the obligation incurred by the grant is superior to the reservation. The interpretation of deeds within the framework of the *Duhig* rationale provides certain and definite guidelines in the interpretation of property conveyances and in title examinations. *See* 1 Williams & Meyers, at § 313, p. 616–616.1.

This Court's application of *Duhig* has been based on estoppel by warranty, a subset of estoppel by deed, which precludes a warrantor of title from questioning the title warranted. *Miller v. Kloeckner,* 1999 [ND] 190, ¶ 13, 600 N.W.2d 881 (citing *Mau v. Schwan,* 460 N.W.2d 131, 134 (N.D.1990)). *See also Acoma Oil Corp. v. Wilson,* 471 N.W.2d 476, 479–80 (N.D.1991); *Sibert v. Kubas,* 357 N.W.2d 495, 497 (N.D.1984). In *Miller,* at ¶¶ 16–18 we recognized the rationale from *Duhig* may apply to a deed with no warranty provisions, and the key question is not what the grantor purported to retain for himself, but what the grantor purported to give the grantee. *See* 1 Williams & Meyers, at § 311, p. 580.34.

[¶ 16] In *Gilbertson,* 301 N.W.2d at 146–48, however, this Court held *Duhig* did not apply when the grantors and a grantee were co-tenants in the property

conveyed between themselves. In that case, three siblings each owned an undivided 1/3 interest in 95% of the minerals in a tract of land, and the State owned the remaining 5% of the minerals. *Gilbertson,* at 145. Two of the siblings, Thorlackson and Charlson, conveyed their interest in the land by one warranty deed to the other sibling, Gilbertson, with a reservation of 50% of the mineral interests. *Id.* The *Gilbertson* Court distinguished *Duhig* and an earlier North Dakota case applying *Duhig, Kadrmas,* 188 N.W.2d at 756, stating the grantee, Gilbertson, was a cotenant with the grantors, owned a percentage of the outstanding mineral interests, and had actual notice of that mineral interest. 301 N.W.2d at 147–48. This Court said the grantee, Gilbertson, was clearly aware her grantors and cotenants, Thorlackson and Charlson, were not warranting title to 50% of the minerals plus the 5% owned by the State and the 31 and 2/3% owned by Gilbertson. *Id.* at 147. This Court said under those circumstances there could be no implied warranty Thorlackson and Charlson were warranting what they reserved. *Id.* at 147–48. This Court held Thorlackson and Charlson retained between them 50% of the mineral interests reserved in the warranty deed. *Id.*

[¶ 17] Here, the Goughnor defendants argue the family intended for the eight warranty deeds to effectuate a single transaction to split the minerals so John Q. Nichols would own 1/4 of the mineral interests and the eight siblings would collectively own 1/4 of the mineral interests. The plain language of the separate warranty deeds, however, cannot be read together as part of a single contract or one transaction, and the parties are responsible for the legal consequences of the separate deeds. *See State ex rel. Sathre v. Moodie,* 65 N.D. 340, 358, 258 N.W. 558, 566 (1935) ("When you intend the facts to which the law attaches a consequence, you must abide the consequence whether you intend it or not.").

[¶ 18] The Goughnour defendants' reliance on the result in *Gilbertson* is misplaced, because here the eight grantors each executed separate warranty deeds to John Q. Nichols rather than joining in one deed for a single transaction as the grantors did in that case. *See* 301 N.W.2d at 145–48. Because this Court has said the *Duhig* rationale does not apply to a grantor's transfer to a cotenant and the grantor in each deed in this case could not reserve 1/4 of all mineral interests in the tract of land, we agree with the district court that the reservation language in each deed reserves 1/4 of each grantor's 1/18 mineral interest, and we conclude the court correctly applied *Gilbertson* to the separate deeds. The legal effect of the deeds means the eight grantors collectively reserved a 1/9 mineral interest and conveyed the balance of their mineral interests to John Q. Nichols.

[¶ 19] Under the unambiguous language of the separate deeds and the legal effect of those deeds, we conclude the district court did not err in analyzing the separate deeds as separate transactions and in construing the legal effect of the deeds to allow the grantors to collectively retain 1/9 of the mineral interests in the land.

IV

[¶ 20] We affirm the summary judgment.

[¶ 21] GERALD W. VANDE WALLE, C.J. DALE V. SANDSTROM, and MARY MUEHLEN MARING, JJ., concur.

KAPSNER, Justice, concurring in the result.

[¶ 22] I concur in the result. I do not believe that *Gilbertson v. Charlson,* 301 N.W.2d 144 (N.D.1981), takes the transfers between the siblings out of the application

of the *Duhig* rule solely because in each deed the grantor was a co-tenant with the grantee. If *Gilbertson* applies to the deeds, it is because of the co-tenancy coupled with the notice of the status of the mineral interests provided to both grantor and grantee by instruments of record. The final decree of distribution of John C. Nichols' estate was recorded in the office of the Register of Deeds in December 1951. The final decree of distribution of Margaret P. Nichols' estate was recorded in June 1955. The record title demonstrates that no sibling had a "25%" interest to reserve and John Q. Nichols, the grantee, who was the administrator of both estates, was aware of this. *See Sibert v. Kubas*, 357 N.W.2d 495, 497–98 (N.D. 1984).

[¶ 23] If the deeds did not reflect the parties' true intentions, a timely action for reformation would have been the method to seek relief.

[¶ 24] Carol Ronning Kapsner

Daniel J. Crothers